Thank you, Your Honor. May it please the Court, I am Dario DeGataldi, appearing on behalf of the appellants in this matter. I would like to reserve three minutes for rebuttal. Just watch the clock as it counts down in front of you. Thank you. Your Honor, as I was sitting here, I noticed the legs on the podium and on the council table. The lion's paws, lion's heads. And it reminded me of something I talked in one of my classes about, and that is, in the early 1600s, King James I was engaged in discussions, shall we say, with the courts over the primacy of the king's prerogative. And he referred to the courts as lions under the throne. And I think that that is what the Secretary would have this Court be, is simply a rubber stamp to do whatever the Secretary deems appropriate. I'd like to begin, really, though, with reading three quotes that I think encapsulate many of the issues and the problems in this case. The first comes from the Federal Register in 1996, where the agency said, arbitrarily taking away money from a high-cost area merely to redistribute it to other areas would violate our criteria and underpay the high-cost area while overpaying the low-cost area. 2007, again from the Federal Register. We, that is, Medicare, CMS, have no authority to reduce the gypsies of some localities in the state to offset higher payments to others. In 2010, the director for CMS said in a public statement that went out with the Institute of Medicine report on payment accuracy, he said CMS has a responsibility to ensure that payments are accurate. And now, in the appellee's brief, we learn that the Secretary has considered the changes in relative costs and demographics, but has nonetheless decided to maintain the status quo. So after 14 years, and $4.5 billion in underpayments to 260 counties, and $4.5 billion in overpayments to 2,419 counties, the Secretary has known about this problem since 2001. The Secretary has decided to do nothing. Counsel, the problem we have in this case, I gather, is the standard of review. Aren't we told by any number of cases that we have to be very deferential to the Secretary's determinations if they are plausible or reasonable? Irrational. Absolutely. Irrational. Absolutely. And we don't dispute that. But the key, I think, to this case is the record. And in reviewing the record, which the Court needs to do, which cases teach us that the Court needs to do, the Secretary's positions are not supported and are shown to be irrational. This is not a social welfare case. This is not a social benefits case. This is not an entitlements case. This is a case where doctors and other suppliers of medical services have provided services and are seeking reimbursements for those services that they've already rendered. Counsel, is it the duty of the Secretary to prove her deductions are rational, or is it your duty to prove that they are irrational? It's our duty, Your Honor. It's our duty. And I think that we've done that, and those are some of the things that I intend to speak to today. This is also a case, Your Honor, that goes beyond simple underpayments. It's a case that affects beneficiaries in the rural counties who are being overcharged as a result of the Secretary's payment structure. It affects the beneficiaries in 260 urban counties who are being denied access to medical care. If the Court reviews the unopposed motion to expedite this oral argument, the Court will see declarations from county medical association presidents and county health directors that detail how those services, how that access to medical care is being denied. And further collateral damage shows up in the fact that insurance companies pick up Medicare rates and pay under their policies those Medicare rates. So this is a case of truly great significance, and I know the Court will pay it the attention that it deserves. Well, counsel, help us with the analysis here. You're not making a statutory claim or statutory argument. In fact, you probably foreclosed. Exactly. But your obligation is to tell us where the discrimination is and to what extent it is disparate treatment or some constitutionally based theory. Okay. Happy to do that, Your Honor. Regent's Hospital, a case that we've cited over and over again in our opening brief, and a case that the Secretary, in their brief, completely ignored. Completely. Regent's Hospital, the U.S. Supreme Court said that Congress's overriding purpose in Medicare is reasonable, not excessive, or unwarranted cost reimbursement. The record shows that in 1996, the agency set up a locality structure, we still have today, based on payment accuracy standards that they came up with after reviewing a report by H.E.R. that they had commissioned, and came up with the 5 percent iterative method that we describe in the brief. And beginning in 2001, because of changing in economics and demographics, those standards were no longer being met. Now, the agency says, or the Secretary says, that those aren't really standards, but I'm not exactly sure what they were, whether they're guidelines or what, but I think we used the word standards in the exact way it was intended to be used. And that is something against which things are to be measured. And in 2001, representatives of the Sonoma County Medical Association and Santa Cruz County Medical Association met with representatives of the agency and laid out how their costs had risen to a point where their counties should have been, under the 1996 standards, they should have been made single-county localities so that their payments were only based on their counties' costs, instead of the average of all of the counties in the rest of California locality, all 47 counties, which include extremely rural counties such as Alpine County, Siskiyou. And since 2001, the problem has spread across the country. And our complaint shows that by this year, at least 260 counties are experiencing the same disparate treatment. Other counties are treated by Medicare, urban counties such as San Francisco, San Mateo, Santa Clara, Los Angeles, Ventura, Orange County. Their costs are based on their counties' costs and their counties' costs alone. Is there some evidence in the record that there is an intent to discriminate between these classes? Well, Your Honor, I think when you understand that because the costs are averaged, the fact that high-cost urbanized counties are being included in the rest of California, for example, their costs raise up the costs that are paid to rural counties. That's not an accident. That's robbing Peter to pay Paul. That's the only place that Medicare can get the money to raise the money that's being paid to the rural counties, is from those high-cost counties in the multi-county localities. I think if Medicare has known since 2001 that this is going on and continues to implement that program, that shows intent, because that's the only source of money that, as a budget-neutral program, that they can use. Is it your position that Medicare, the Secretary, has an animus against rural doctors? Against rural doctors, no. It's just the opposite. It's the opposite. I'm not sure that it's an animus, Your Honor. And to be truthful, as I was thinking about this yesterday, I think that the Secretary has been acting like a turtle since we filed this case in 2007. I think that they have been afraid to make changes to the program because of the dependency of this case. Now, this case is, I think, truly unusual because when we filed it in June of 2007, June 4th, about three weeks later, on June 29th, 2007, the GAO issued a report that exactly tracked everything that we were saying. It talks about the underpayments. It talks about the problems that have arisen due to economic and demographic changes. But what is the Secretary's legitimate purpose here? What is the legitimate purpose in overpaying doctors in low-cost counties? What is the legitimate purpose in underpaying doctors in high-cost counties? What is the purpose of burdening beneficiaries with overcharges? What is the purpose of burdening beneficiaries with lack of access to care? Counsel, you're down to less than three minutes. If you wish to reserve, you may. I do, Your Honor. Yes, sir. You may do so, counsel. We'll hear from the government. May it please the Court. Melissa Patterson for the Secretary. There's only one issue left in this case, and that's whether plaintiffs can make out a case under the Equal Protection Clause. And the district court offered two routes to dismissing that claim, and we think either is an appropriate ground for this Court to affirm on. First, we think the district court properly recognized that while cloaked in the language of the Equal Protection Clause, this is at base still a challenge under the statute, still saying the Secretary is not implementing the statute accurately enough. And this Court has already recognized and the district court recognized that when what you're really complaining about is the statute, and how the statute is being implicated, and an alleged abrogation of statutory duties. Well, I think counsel made it very clear he's not arguing statute. He's arguing equal protection. Yes, Your Honor. I would point to the part of the district court's analysis where he pointed out that while asserting it under the Equal Protection Clause, essentially what counsel did was just go through and eliminate the source of the duties, and simply allege a free-floating duty to adhere to what he describes as the 1996 accuracy requirements. And so when you have that type of claim, when it's really a statutory claim dressed up as a constitutional claim, because of the judicial review bar in this case, we think the district court was correct that you have to do something more. You have to assert a, in the first district court opinion, a genuine constitutional claim to get past that judicial review bar. Well, isn't he saying in essence that the Secretary is discriminating against doctors in some counties to favor doctors in the rural counties because of some sort of a collateral policy? Now, to the extent that there is a classification here, he argues that there is an unreasonable discrimination between these two classes. Would you be able to respond to that? Well, yes, Your Honor. I think this falls into whether or not this is a colorable constitutional claim. And I recognize, and I think the Supreme Court has recognized, that the merits may bleed into the initial threshold inquiry of do we have a substantial constitutional claim, a genuine, a colorable constitutional claim, such that you get to evade the judicial review bar. And I want to note that these types of locality determinations are, there are always winners and losers. People will always be upset with how they're drawn. So if it is just as easy to evade the judicial review bar and get into Federal court and start questioning the Secretary's bases for drawing the lines as she did by cloaking your language, cloaking your claims in the language of an equal protection claim, of a due process claim, you could see this type of proliferation of challenges that the judicial review bar is meant to preclude. Counsel, can I ask a question? If the Secretary decided, oh, to heck with all this nonsense, we're just going to make California one great big unit and we'll just have one rate for all of California, could they do that? Yes, Your Honor. There are no statutory limits on how exactly or I think that would certainly be a rational implementation of the statute. And, in fact, if you look at the Secretary's notice from 2004, she explains we could, you know, we're trying to balance simplicity and administrability with accuracy. We know we have to do some geographic adjustment. So at one end of the extreme, you could have just that. You could have 50 localities on a state-by-state basis and all of California would get one rate and all of Rhode Island would get one rate. And that would be very simple, but it might not optimize our accuracy in a way that we think appropriate. Now, at the other end of the extreme, you could have every county in the nation be its own locality. And maybe would that be a more perfect fit in terms of accuracy of costs? Yes, but that would be extremely cumbersome. We would have hundreds, if not thousands, of localities, and that's simply unadministrable. So to put it more succinctly, what you're saying, if they ask for a particular paradigm for adjusting where the money goes, that's got to be based on the regulation or on something the Secretary has done. It certainly can't be based on any overarching duty. Is that your point? Because the Secretary could say, nuts, we're not going to do any of it. Is that what you're saying? I'm not sure I understand the question to the extent you're suggesting that there's a range of options that the Secretary can choose from and that our inquiry here under the Equal Protection Clause is, is her choice rational, then I would agree. Again, let's think about what the Equal Protection Analysis is. It's not, is this desirable, is this fair, is this wise. It's a pure rationality. And this Court's job is to figure out whether there's any conceivable basis for the Secretary's choices. Now, we don't have to go very far to figure out what those bases are since the Secretary has repeatedly addressed this issue in Federal Register notices and explained that pulling out counties under the 1996 standards would destroy the major goal of simplification and administrability of the program. So we don't, we, the Court should speculate if it thinks, if it doesn't like the bases the Secretary has given, it does have to speculate as to any other plausible, rational basis. But we don't have to speculate. You know, we, we can simply look to the Federal Register notices. The ---- But, but the recital of administrative convenience or minimized administrative cost and burden can't be some sort of a magic wand that will justify anything and everything the Secretary does. Of course not, Your Honor. But I think looking over ---- But isn't that what's, what's we have in this case? Not at all, Your Honor. Is the Secretary simply relying on administrative convenience and its policy of, of supporting higher rates for doctors in rural areas at the expense of doctors in urban areas? No, Your Honor. And I think looking over the course of the Secretary's implementation of the program sort of idea that this is a magic wand to get out of any sort of need to explain yourself. So let's go back to the beginning. When Congress moved from a reasonable cost system to a fee schedule system that came with geographic areas from fee schedule areas, the localities in place at the time numbered 210. Now, when the Secretary first redrew those localities, we went from 210 to 89. And the Secretary identified as a major goal, listen, this is a complicated program, and it is very hard to administer. And one of our major goals is to go to a ---- Why is it hard to administer? That is a conclusion. It's an abstract thing. Give me an item, give me a detail as to why it's more difficult to administer 210 localities than 89 localities. I think you would have to go back to the Secretary's 1996 notice. I think it's fairly self-evident that when you have 210 different reimbursement regimes, that that is more complicated than having 89. You have different prices. You have different prices. That's what we're talking about. We're talking about administrative allocations. We're talking about prices. So you're talking about 210 price zones versus 90 price zones. These days with data collection and data search that we have, why is it administratively more burdensome? I mean, what's the rational ---- Is there any evidence that, yes, it costs more to administer many of these localities than it costs to administer a few? Does the government even consider that? Well, Your Honor, again, I think that what we would look to is the Federal Register notices. And we're not saying that this is this ---- that administrative simplicity is some sort of panacea to the inquiry here. But let's ---- My question to you, Ms. Patterson, is this. I don't know that the record does reflect that, Your Honor. To having more localities than there are to having fewer localities. I don't know that the record does reflect that. Then why do you say that there's more administrative costs? Because is this sort of a motto, a slogan, which the Secretary has that wishes to obscure any further inquiry? No, Your Honor. Then what's the basis for it? What's the rational basis for your Secretary saying there are more administrative costs? Your Honor, I can't point to a part in the record, but I can certainly go back and ask the agency. Give me a reason. But let's take a step back and look at what the Secretary is trying to do here. The Secretary has to divvy the entire nation up into some unspecified number of localities. All right. Having in the record there were, I believe, complaints, and I can go back and check, that the preexisting localities were too complex, were drawn along irrational lines. So the Secretary comes in and says, okay, I need to redraw these lines anew. And let's remember the Supreme Court has specifically said when we are talking about line drawing, when you're divvying up a finite pool of resources, the Supreme Court's made very clear that that type of line drawing inquiry gives added force to the deference of how the government is proceeding. The Secretary says That assumes that there's some rational basis for redrawing the lines. My question to you again is, what is the rational basis for saying that there are added administrative costs due to more localities? Is there anyone who's actually looked at how many software programs you need, how many computers you need, how many desk drawers you need? If you have 280 rather than 90 or whatever the numbers are, or is this just some sort of a thing that we have to accept on faith? Your Honor, I don't know. I can go back and check with the agency and look at the record again. But I think in terms of what sort of inquiry this Court is supposed to engage in, you look and you think, is there any plausible basis? Is it plausible to think that a system is simpler to run with 50 or 89 or fewer localities than more? Yes. Is it plausible for that the Secretary was concerned that by redrawing these lines they might disadvantage rural areas by decreasing access to Medicare providers? It's also more plausible to think that more accurate pricing results in better service. Your Honor, it is not this job's court to optimize more accurate pricing or what they consider to be. I think there's a built-in judgment there about what's more or less accurate, Your Honor. Again, we have to, the Secretary has to divvy the country up in a way that balances multiple concerns, that makes sure Medicare providers continue to operate in rural areas. This program proceeds on a budget-neutral basis. How often would the Secretary have to divvy it up? If you had a different program, would you have to divvy it up every year, every five years, every ten years? Is there any system to look at that? I take it that's what the Secretary has been looking at. But I guess what I'm asking, if you make a more complicated system so that as fluctuations go between year to year, should the Secretary be divvying it up every year? Is that any factor in this? Is that what? Yes, Your Honor. I think that goes to the, to the Secretary's, the rationality of the Secretary's choices here. The more complicated you make the system, the more often you may have to reconfigure it. And let's note, under the, under the plaintiff's regime, any time a county or a Medicare supplier thought that they had, their payments had become too inaccurate at some point in time, the Secretary would be obliged, as a constitutional matter, to reconfigure the localities so that they got a more accurate payment. That's no way to run a railroad. There's certainly, I think, no requirement in the Constitution that the Secretary proceed in that fashion. I think the appropriate recourse here is, is the one that ultimately resulted in legislation that came down on April 1st. And it, and it, by legislation, Congress has now decided that in the future, California's localities will be drawn with reference to metropolitan statistical areas. Now, I believe, as OMB has currently defined those metropolitan statistical areas, that means that all of the plaintiff counties here will, in fact, become their own fee schedule areas. But that was done through the political process, where the wisdom, fairness, and desirability of government choices are best played out. It was not done through the guise of an equal protection claim that would leave courts second-guessing complicated line-drawing systems and competing social goals. The Secretary made clear that there was real concern that reconfiguring the counties in the way that plaintiffs want here would result in decreased access to Medicare providers for those in rural counties. That in and of itself would be a rational basis for her being cautious in going forth and extracting these counties and giving them their own locality. Again, this is a budget-neutral program, so the more you give to them, the less you're giving to other counties. That in and of itself, we think, would be a rational basis to sustain the Secretary's choices here. Was that a purpose in the legislation? Was that called out in the legislation, that the purpose of Medicare reimbursements was to make sure that there are rural doctors? I don't know that it was at that level of specificity. Then why do you even mention that? If that's not a valid legislative purpose, why is the Secretary glomming on to that idea? I don't think it's a glomming on, Your Honor. The Secretary has to implement Medicare nationwide. I think that inherent in that purpose ---- Could she implement Medicare nationwide based on her own concepts of what Medicare should do, regardless of what Congress said? Your Honor, I think it's certainly a legitimate government purpose for the Secretary to try to make sure Medicare works in all localities. But by her own lights, answer me this question. Is there anything in the legislation which says the Secretary is empowered to consider the availability of rural doctors in setting rates? No, but nor is there anything in the legislation that says she is not, Your Honor. Again, there is ---- there are many gaps left in the Medicare statute, and the Secretary has to fill them. Simply as a matter of Chevron deference, I think any suggestion that this ---- What's the ambiguity that invokes Chevron? Your Honor, to the extent that the Secretary is left to fill gaps, to draw localities, and to implement Medicare nationwide ---- No, no, no. If the statute is unintelligible because it is ambiguous, then we can invoke Chevron. But tell me where the statute is ambiguous as to rural doctors. Your Honor, I don't think that's the appropriate inquiry. I think the appropriate inquiry would be ---- It's a question I've asked you. But I am going to resist that that is the inquiry that this Court engages in. If there are no further questions, we ask that the Court affirm either, because the district court correctly dismissed this, because this is, in fact, a statutory claim, not a constitutional one, or the alternative that this ---- that on the merits plaintiff's claim simply fails. These decisions are well supported by rational basis. Are there questions from my colleagues? Apparently not. Our questions actually took you almost two minutes over your time. Thank you, counsel. Thank you, Your Honor. Mr. Gattaldi, explain to me why we shouldn't affirm simply on the grounds of the Supreme Court's case in Armour v. City of Indianapolis. That was a case where two kinds of persons had paid a sewage tax, lump sum and staged payments. Indianapolis decided to dispense with the staged payments a little bit like for giving loans, right? And the people who paid lump sum said, wait a minute, that's unequal protection. The Supreme Court said there was a rational basis for Indianapolis doing that because they would have to have a whole collection system for the people who paid in staged payments. That's an administrative cost. Why isn't this situation here exactly the same? I'll tell you why, Your Honor. Because the record that counsel ignores, that the Secretary ignores, shows that the administrative cost would be minimal. The GAO report in 2007 specifically examined the effect of changing the locality structure and the effect on the administrative burden. And the GAO found that the effects would be one-time and minimal because, as Your Honor was alluding to, this is a database that we're talking about. This is simply a computerized system that collects and stores cost data and divvies it up between counties and then amalgamates that data for the multi-county localities. Let me follow up that question from my colleague, Judge Bea. What is your best case to offset Armour? I think in part it's Your Honor's Merrifield case, the case that dealt with pest controllers, and along with that, the New Orleans v. Dukes. These cases deal with economic protectionism, and I think that that is exactly what's going on here. There is nothing in the Medicare statute that allows the Secretary to benefit one class at the expense of another. Congress has already identified that field. Congress has already included a number of provisions in the Medicare Act that directly benefit rural counties, frontier states, and Alaska. And the Secretary is given no authority to do any such thing. Judge Fernandez, you asked about how often does this need to be done. Well, in the GAO report, they recommend it every ten years because that's when the census would come out. Medicare collects new data every three years and sets the payment rates on a tri-annual basis. That's another. We're not asking for anything specific in terms of future changes to the system. What we're asking for is to the reimplementation of the 1996 standards, which has a 5 percent error factor built in. It's we're not asking for perfect accuracy. This is public health that's at issue here, Your Honor. And we've cited cases that, again, the Secretary has ignored, that say administrative burden doesn't play a part when we're talking about public health. Well, we're also talking about constitutional discrimination, and that's what I'm still listening, trying to look for, trying to hear. Well, we have, it's admitted that there's three different classes. One class that's paid accurately, one class that's overpaid, and one class that's underpaid. What's the legitimate government purpose for that? We've laid out in our briefs every single excuse that the agency or the Secretary has given. Every single one. And none of them. Would you say that's purposeful discrimination between the three classes or among the three classes? By this time, it is, Your Honor. In 2001, it wasn't. Economics and demographics changed, and it was nothing that the Secretary had done. But the perpetuation over 14 years in the staggering amount of $4.5 billion has got to be intentional, has got to be purposeful. They decided to do nothing. It's not accidental. We only have to show that this intent is, A, part of the reason for this perpetuation. And because it's a budget-neutral program, the only way that the Secretary can fund these windfalls to the 2,419 counties is by taking it from the 260. All right. Thank you, Counsel. Your time has expired. The case just argued will be submitted for decision, and the Court will adjourn.
judges: O'SCANNLAIN, FERNANDEZ, BEA